Good morning. Good morning. May it please the court, Natasha Khan on behalf of Appellant Atef Bandary. I would like to reserve three minutes for rebuttal. All right. Thanks. During a flight, Delta flight attendants instigated a confrontation with Mr. Bandary, caused him to fall, handcuffed him so tightly that his wrists bled, and caused his pants to fall down, exposing him in front of other passengers. Seeking to recover for his lasting physical and emotional injuries, Bandary sued Delta under the Montreal Convention. Because flight attendants sought the assistance of an on-board law enforcement officer after the incident began, however, the district court dismissed Bandary's claim as immunized under APSA. But that statute immunizes only reports of suspicious behavior, not all conduct that follows. If we agreed with you on that, would we be creating a circuit split with the Fifth and Second Circuits? You would not. There are ways to read the Second and Fifth Circuits cases in a way that does not create a circuit split, because in neither of those cases did the reports actually immunize airline conduct beyond the report of a suspicious behavior. So in the Second Circuit case, Baez, the only conduct at issue was a gate agent's report to the TSA that the passenger threatened that she had a bomb in her bag. So even though the Second Circuit stated a broad rule that all adverse consequences following from the tip are immunized, the actual conduct at issue to which that rule applied was only the report of a suspicious behavior. Could you help me with a procedural question, though? We did have a trial before already, correct? Yes. And now we're assessing a summary judgment grant. Yes. Prior to the first trial, the same summary judgment motion was denied. Correct, yes. So in the circumstance that we're in, can both parties point to trial evidence to establish disputed fact, yes or no? Yes, because for two reasons. So first, much of that trial evidence was included in the summary judgment motions that the parties both filed. So it became part of the summary judgment record in the standard way that... So when I think of order of operations, before we get to immunity, we have to decide, was there an accident? Yes. Okay. And so in order to decide whether there was an accident, frankly, also as to the immunity question, whether there was suspicious behavior, does the jury verdict come in conclusively or even just to establish a disputed fact? Do you understand the question? Yes. The jury verdict, I think, is persuasive in the sense that it shows what a reasonable jury could find as to suspicious behavior specifically. I don't believe... The jury did not make a finding on the accident. That was just a district judge. Okay. But... So, but it has persuasive fact. It's not a conclusive fact, right? Yes. Let me back up a little bit and clarify something. The only issue that's before us now on appeal is the summary judgment, right? There's no appeal of the court's ruling on the motion for new trial. That's correct, Your Honor. But to go back to your question, Judge Brass... So to prevail, you want to go back for another trial? Yes. On damages and liability or is the liability... The district court... You aren't disputing that the district court held when it said there were excessive damages that that infected the liability and therefore the new trial you would get if you prevail is both liability and damages? Yes, Your Honor. Okay. But yeah, and so just to go back quickly on the Fifth Circuit point, the Fifth Circuit in Abdullah, the other case that deals with this ATSA question, held that the airline was not immunized for its conduct in deciding to cancel a flight. So I do not believe that... There's a way to hold that ATSA by its text only immunizes disclosures of suspicious behavior without actually creating a circuit split because, again, no other circuit is held as here that ATSA immunized airline conduct beyond just the report of suspicious behavior. Because here, the basis of Mr. Banderi's claim is the assault and battery that flight attendants took in handcuffing him too tightly, causing his wrist to bleed, causing him neck and shoulder pain. Let me ask you, counsel, if we don't agree with you on the interpretation of the statute and focusing now on whether there are triable issues of material fact, particularly on the bodily injury aspect of it, here's what the district court said when it granted summary judgment in favor of the airlines, that Banderi directly testified at trial that the first time any of the flight attendants touched him was when he attempted to put on the cuffs. Further, Rodemeyer, Cook, and Vahe each testified that the cuffs were first applied after Vahe arrived on the scene. If the district court's characterization is correct, there's no triable question as to whether there's bodily injury. And you push back on that. There are bits and pieces of evidence here. It's hard to cobble them together, let's put it that way. So tell me, what is the triable question of fact from the trial evidence of bodily injury that occurred prior to the reporting to Agent Vahe? Yes, so your Honor, the problem here is that the district court misunderstood the standard. Even if you agree that ATSA applies to conduct beyond just the reports of suspicious behavior, the standard that the Fifth Circuit applied was whether the injurious conduct is directed by law enforcement or whether it's attributable to the airline. And so the triable question of fact here is whether the injuries to Mr. Banderi were directed by the airline or were directed by law enforcement. Post-Vahe. Yes, but even post-Vahe, there is an abundance of evidence. Well, okay, let's assume we don't agree with that. Do we agree that there's immunity for conduct that occurred after Agent Vahe came onto the scene or was reported to Agent Vahe? Are there triable questions that remain then as to bodily injury? Yes, but there is a lot of evidence suggesting, for example, just to say one thing, Your Honor, at ER 224, Rotomayor testified that she told Agent Vahe to put on the cuffs. She likewise testified that she- No, I'm trying to get beyond that. No, I understand you're disputing that. I'm not treating it as concession in any way. I'm now trying to drill down on that one point of whether any evidence really remains that would create a triable question of fact. If we get there, now we haven't talked about the cases, so I'm not going to treat your responses as any sort of concessions on those points. We've got the brief and we're well aware of the  Okay, thank you, Your Honor. Yes, so there is still a triable question of fact over whether Bandery suffered any bodily injury prior to Vahe's arrival on the scene. He testified- What were those injuries? Yes, so he fell and landed on his bottom and he testified at ER 381 that his bottom was hurt as a result. And under the plain definition of bodily injury, the case law and the dictionary definitions of bodily injury suggest that pain or hold that pain is enough to establish a bodily injury. So he did fall prior to that Agent Vahe's arrival and that's a bodily injury. One fall? Yes, Your Honor. So that fall was before Agent Vahe came to the back of the plane? Yes, it was before Agent Vahe came to the back of the plane. And then anything else in terms of bodily injury that occurred prior to Agent Vahe coming on the scene? No, I don't believe so. But again, there is an abundance of evidence suggesting that once Agent Vahe came onto the scene, that it was still Rotemeyer who was taking all the key decisions including directing him to handcuff Mr. Bandery, asking him to remove the cuffs when they were applied too tightly. Rotemeyer also testified at ER 460 that she applied the cuffs to Mr. Bandery. And likewise, Rotemeyer testified at ER 446- The questions, I think, are really very precise, at least, and I don't mean to suggest what's on the mind of my colleagues, but it does seem like the question of when was there an accident and what was the accident intertwines with the scope of immunity question. In other words, for example, the Fifth Circuit, the Second Circuit, do they say that anything that airline carrier people do after they call is immunized? Or do they require that the law enforcement agent has appeared and has taken over this situation? Do you understand the question? Yes. So this comes from the Fifth Circuit's case in Abdullah, and they require that the law enforcement officer be the person who directed the actions, such that even after the call was made in Abdullah, the Fifth Circuit held that the decision to cancel the flight was not immunized because that action was attributable to the airline. Would you agree, though, that the primary bodily injury occurred after he's controlling the scene? He's holding, and that's when the cuffs are too tight and causes the injury? No, I would not agree with that, Your Honor, because as I said, the cuffing, even, you know, there's a dispute of fact over who actually placed the cuffs on Mr. Bandery, but Rotemeyer, the Delta flight attendant, testified that she made the decision, this is at ER 460, she testified that she made the decision to place handcuffs on Mr. Bandery. She then testified that once Mr. Vahe was on the scene, she directed him to place cuffs on Mr. Bandery. She then testified that when she saw the cuffs were too tight, directed Vahe to cut them off. And she then also testified at ER 446 that she made the decision, after he'd been handcuffed, not to see him until the end. So if we're in the world, if we choose to interpret the statute to allow immunity once, I guess you would say, law enforcement has control of the scene, what conduct would be immunized? When would the responsibility have shifted? There would be no conduct that would be immunized, because I think a reasonable jury could find from Delta flight attendant's own testimony, the lead flight attendant's own testimony, that she viewed herself as in control of the scene. Start to finish. From start to finish, yes. And certainly it's true that Mr. Vahe testified at various points, he made conclusory statements like, I was in control of everything. But I do think this is a question for the jury, because you have directly contradictory testimony from Rotomayor saying that, as I said, the final thing she said was, I made the decision not to see Mr. Bandery until a minute before the flight landed, and I then told him. It was just a coincidence he was on the plane? It was just a coincidence. And does the record reflect what type of law enforcement agent he was? Yes, he was inspector general with the Treasury Department, and he was attending a family funeral. So that's why he was on the plane. He just identified himself at the beginning of the flight. But so Rotomayor's own testimony, and she has no reason to tell, you know, she's not like Mr., you know, she doesn't necessarily have an interest in helping Mr. Bandery. But she testifies, I made the decision to put cuffs on. I told Lucy Cook to go and get the cuffs. I got Mr. Vahe to come and just hold him. I then directed him to put the cuffs on. When the cuffs were too tight, I directed Vahe to cut them off. We then put new cuffs on him, and then I made the decision to hold him in the back of the plane until a moment before the flight landed. And then I, Rotomayor, she testified at ER-446, directed Vahe to — Does that matter when Agent Vahe took control of the scene? He did not take control of the scene, Your Honor. I think that it does matter because  I thought the testimony was undisputed that as he came onto the scene, he intervened and then held Mr. Bandery so that the agent could do the cuffing. And you're right. The agent did do the cuffing, and it was tight. And then the flight attendant did that. It was tight. Agent Vahe checked, and then new flex cuffs were put on. But as soon as he came onto the scene, he was the one that took hold of Mr. Bandery. I thought that part was undisputed. So, Your Honor, I think this is a different question, whether Agent Vahe touched Mr. Bandery and held him versus whether he directed the injurious conduct. And the key question for absolute immunity, assuming you apply the Fifth Circuit's rule, is whether the law enforcement officer directed the conduct, not whether he simply — That's slicing it pretty fine. It really isn't, Your Honor, because I think it's just a matter of understanding that here what we're looking at is, is the airline responsible for the conduct or is the law enforcement officer responsible for the conduct? And to the extent the airline official is directing law enforcement to essentially act as like, you know, a helpful person on board just to hold Mr. Bandery while she makes the decision to place the cuffs onto him, then that makes the airline liable for the conduct, not the law enforcement officer. And I'd also note that, you know, there's also no dispute, I don't think, that nobody — like, Agent Vahe never directed or told anyone to handcuff Mr. Bandery too tightly. So that, too, is not — it's not possible to attribute that to anyone but the flight attendant. But, I mean, is this — again, this is getting a little bit different than the Fifth Circuit case, right, where there's a more of a clear demarcation between what the airline is doing and what the law enforcement officer is doing. But here, you know, a flight attendant engages a law enforcement officer because there's an issue on the plane. They're then working together to deal with the situation. And is it really the right answer to this to be asking, well, who is technically the one doing the work in this situation, when clearly she calls on him to be the one to take control of it and to help? Well, I just — I don't think she called on him to be the one to take control of it. She simply said to him, we have a situation in the back of the plane. Can you come back there? And then following that moment, continued to issue orders to him and to other people on the scene. So, for instance, Lucy Cook, another flight attendant, was on the scene. Agent Vahe told her to leave. She stayed on the scene, looked to Rotomayor, the Delta flight attendant, and only once the Delta flight attendant had told her you should leave did Lucy Cook leave the scene. So, again, just because Rotomayor used Mr. Vahe as like an extra body in terms of holding Mr. Bandry while he was handcuffed does not mean that she didn't take responsibility in her own testimony for all the key decisions that led to his injuries and that she was directing the encounter from start to finish. Oh, go ahead. You go. No, no. I was going to remind counsel that she wanted to save a bit of time. But go ahead. Go ahead with your question. Yeah, I just had a couple quick questions, if that's permissible. One is, just speaking to the accident, is the primary suspicious behavior — why isn't it suspicious when any passenger is photographing carrier personnel? That — well, so here, I think that probably the best evidence of that is that even after Mr. Bandry took a photo of the flight attendant, Lucy Cook stated that the situation was handled and everything was okay, suggesting that a reasonable flight attendant didn't think there was anything that needed to be followed. And what about if I, sort of devil's advocate, present it to you? All that they did was say, take a seat again. You can't be in the line for the restroom. And we all know you're not really supposed to line up. Why is that an incorrect view of what the alleged accident is? So, here, you know, in some situations, sure, like telling a passenger that you can't use the bathroom when, like, it's takeoff — Well, there's a line. There's a line, and he's standing in the line. She says, you can't do that. Go sit down again. Yes. I mean, well, so I guess, you know, I think usually you can stand in a line. But I think more importantly here, here at ER-101, efforts, which is Mr. Bandry's partner, testified that there had been no command issued, that everyone needed to sit down. And there was no evidence that there were — that the reason that Rotomayor asked Mr. Bandry to sit down was that there were other passengers who needed to use the restroom first. And indeed, Gary stated that he was standing up and no flight attendant asked him to sit down. I'm asking that just because there's quite a bit of case law on preexisting medical conditions. And if — one I found out of the ninth was Twardorski. So if an individual is a passenger and they have deep vein thrombosis, and they say, I need to stand up, and the attendant says, nope, you can't. You've got to sit down again. This court said that's not an accident. How is that different than here? Well, sir, I don't know the circumstances of when they were trying to stand up. But I think that what's different here is that you're in a situation where, in general, all the other passengers were permitted to move freely around the cabin. Thank you, counsel. Yes, that is distinguishing. Thank you very much, counsel. I'll give you two minutes back for rebuttal. Good morning, your honors, and may it please the court, Jonathan Cohn for Delta Airlines. With respect, these 60 pages of testimony from law enforcement special agent Vahey resolved this issue, and really it's the first 23 pages of his testimony, in which he says that after he got the call to report, he went to the back of the plane, surveyed the scene, and saw Mr. Bandari take a swing at a flight attendant Tomahawk chalk style. At that point, on page 194, Vahey grabbed Mr. Bandari, told Cook to leave, and he said, and I quote, I'm in charge of the situation. Quote, it's upon me. Aside from the captain, it's my aircraft. The next page, the flight attendants were just there to assist me. He then says on page 196, I asked her, flight attendant wrote a lawyer, to place the flex cuffs around his wrists so I could keep control of him. I asked her. And then on page 202, from the moment I got involved, he, Bandari, was effectively in my custody. This is assuming that conducts immunized as well, more than just the disclosure. It is not just the spoken words. It's the stuff that follows from disclosure. But you're assuming that. So if we assume that, then I have a sort of a who and a when question. Do you agree that if the carrier personnel were to use excessive force on a passenger before Vahey could have gotten there, that conduct wouldn't be immunized? That would be correct, if it's not following the law. So we have the fall on the bottom issue. We don't, for other reasons, which I'm happy to get to now or later, Your Honor. So what then is the when question? The case law, does the case law establish that even, say, an off-duty police officer. So let's imagine we have a suspicious moment and an off-duty police officer happens to be on the plane and says, I'm willing to help. Carrier says no. Have they disclosed? Or does that individual, anyone who has any law enforcement qualifications, to the extent they engage, at that point, the carrier is scot-free? That might be a hypothetical. But to be clear, in this case, he was not merely an off-duty law enforcement officer. He registered with the airline before the flight as a law enforcement officer. He registered his gun as well. So he had the full panoply of obligations. And she called, just to understand, she calls the pilots. The pilots say, oh, we're lucky he's here. Then they get him. And he, in your view, is it indisputable that by the time he's involved, he's in control, at least for the cuffing, which I take it you'd say is the worst bodily injury? The only part of the injury. And absolutely he's in charge. And look, if he was not there, the pilot would have called ground like an ilch is in another case of creating a split with. He could have gotten direction from the law enforcement on the ground. For that matter, I think the law enforcement, the pilot himself can be considered a law enforcement officer because he's the in-flight security coordinator. Those are hypotheticals that need not be addressed here because you had a law enforcement officer on the plane. He was registered. There was a disclosure to him at the pilot's suggestion. And he responded. And he unequivocally took charge. And Mr. Bandari is in no position to refute it. He says on page 196 of the excerpts of record that I don't remember who did what. He says repeatedly, 180 to 197, that he could not remember the details. So you have the unequivocal, undisputed, unrebutted testimony of Vehi that he was in charge. It was his plane. He was in control. Bandari was in his custody. Separate premise question. In other words, it is a little bit of an unusual posture that we had a full trial and we had a jury verdict. So we don't even get to this line of immunity discussion if there were no suspicious circumstances. And my question to you is, how is that not a disputed issue of fact if the jury verdict itself said, by engaging special agent Vehi's assistance, did Delta make a voluntary disclosure of any suspicious transaction? No. A few things. They first said yes. And then about 40 minutes later, they answered no to the same question. There's a conflict. There's inconsistent evidence. Besides... But if there's inconsistent evidence, that's the end of the game for you. Well, no. This is an issue that never should have gone to the jury in the first place. The jury never got the proper instruction, which under Air Wisconsin is when in doubt report. That's the standard. Now you're trying to impeach the verdict. I didn't see that in the briefing here. We had a trial and we have a jury verdict that's checked no suspicious circumstance. You're saying there is no material issue of fact the opposite way? There is no material issue of fact. First of all, the jury had two inconsistent verdicts. Second of all, this is an issue of immunity. The issue of immunity should have been resolved at the earliest possible stage under the proper standard, which is when in doubt report. Mr. Bhandari is someone who not only took pictures of flight attendants, but paced around the plane, not just to go to the bathroom, but in his words, he walked around a lot because he's a walker. He scared passengers who thought he was a terrorist. Right, but that's such disputed testimony. Cook herself said, I didn't say it, but Rudmeier, whatever her name is, seems to have different viewpoints of it as to whether he was suspicious. To me, it's trying to go to the bathroom several times and a photograph. Your Honor, the Supreme Court said when in doubt report without hesitation, do so immediately. Do not assess, do not investigate. I flew here on a plane a hundred times out of a hundred. I would want the flight attendant to tell the law enforcement officer who happens to be there what happened. And at that point, as plaintiff themselves concede on page four of their reply, once a report is made, law enforcement officers determine and execute a response. The only question is, should they have made a report? And by the way, airlines have an obligation under civil penalty to make reports. They have to make. I may agree with all those policy arguments. The difficulty here is we have a trial and we have witnesses that have said there wasn't suspicion beyond a man needing to go to the bathroom a lot. And then we have a jury verdict, which you may be saying is an inconsistent verdict. But how does that how do we just assert ourselves? There's no issue of fact when it seemed like through trial to verdict, there was a direct issue of fact on suspiciousness. The jury was not asked the right question, which is was there room for doubt? The standard is when in doubt report. And you objected to the jury instruction. We did not object to jury instruction. But here we're not reviewing the jury instructions. We're not reviewing the jury. But now you're telling me we can just ignore that because you're saying it's What I'm saying is it's not probative evidence in this case because they weren't asked the right question. And the question shouldn't have gone to them in the first place. Immunity, qualified immunity as well as presumption of responsibility. Who prepared the jury verdict? Pardon? Who prepared the jury verdict? Who projected? Who prepared it? Both sides stipulated to it? It was jointly prepared by both sides. And the Court had some doubts at the end of the jury trial and granted a new trial. And the jury was not asked the right question, and they had two inconsistent answers to the question. But this is just like any other immunity, which should be resolved at the earliest possible stage. Otherwise, the benefits of the immunity are lost. And if an airline's report is always going to be second-guessed by a jury years after the fact, then there's going to be a resistance to report because of benefits. So a similar question as to the bodily injury. Now we're getting past question number one. The question of prior to Agent Vahey's arrival, did Mr. Binderi sustain a bodily injury that was caused by the conduct of Delta Airlines? What do we do with that? What's the interplay between that jury finding versus the determination of whether there's a triable question of fact now as to bodily injury? The only argued bodily injury before Vahey was falling on his bottom, which is inconsistent with both the record and the law. On the record, he says, this is page 381, that his bottom hurt, comma, his stomach hurt because the diarrhea. He does not link it to the fall. But second, mere hurt or pain is not a bodily injury under this court's precedent, the Supreme Court's precedent. But the verdict, again, says bodily injury. It doesn't say mere pain. So juries make factual findings, but in this case, the factual finding is inconsistent with the legal question of what is a bodily harm. And mere pain is not bodily harm under this court's precedent, under the Supreme Court's precedent, the nearer court of appeals decision in Rossman. So a jury verdict that is inconsistent with the law should not be sustained. Here, the court had a new trial. So falling and being injured on your bottom is not sufficient bodily injury? The question is, what's an injury, right? And mere pain is not a bodily injury. This physical manifestations are not enough there to be a bodily injury. But that would be on your burden. You would have to correct the verdict, but you agreed to this verdict. You didn't say there was no evidence justifying that instruction. Well, after the case, we did move for the court to reject the inconsistent verdict form. We also filed a motion for a new trial. The court disagreed with us on which verdict form to adopt, but she did grant the new trial. So, at this point, that verdict form is not appeal because it's no longer an issue. We would be appealing it if we had to, but the verdict form doesn't have any sort of force of law at this point. And besides, you know, that verdict form, admittedly prepared by both parties, didn't ask the right question, which is, was there doubt? Because under Supreme Court precedent, the question is, was there doubt? When in doubt, you have to report immediately, without hesitation, without assessment. And certainly in this case, when you have an individual who is walking around the plane, not just to go to the bathroom, but walking around a lot, who argues the flight attendants, admittedly, who is taking pictures of flight attendants, I mean, this is a far cry from bias, even, in which the Second Circuit found that there was enough. In that case, it was just a bad joke, but having a bomb. In this case, you have more than suspicious behavior. You have misbehavior. You have an individual who is acting erratically, and then he took a swing at a flight attendant. There's a dispute as to whether or not he hit the flight attendant, but there's no doubt he swung at her, and a grand jury eventually indicted. This is far more than bias, far more than ilches in a case that they have disregarded. In that case, the poor individual is suffering a medical condition in the bathroom, and the court still said there was enough for a suspicious transaction. Here, we have an individual who is taking pictures of flight attendants, who is staring at passengers, walking around the plane, takes a swing at a flight attendant. Passengers admit they're scared. Tim Lesnar, Sarah Lyons, multiple passengers say they're afraid. They think he's a terrorist, and the grand jury indicts. After all that, you certainly – Wait, wait, wait. You're going quickly. So I didn't sense – I didn't – the criminal trial, of course, ended with acquittal. So when you're starting to say you have passengers that thought he was a terrorist, where's the record evidence from this civil trial about terrorism? That would be excerpts of record 48 and 49. That was Tim Lesnar saying that he had concerns, and then you had – Concerns that he was a terrorist based on going up and down the aisle and going in and out of the bathroom? That was Mr. Bhandari's words, that he thought passengers thought he was a terrorist. Okay, so that's why I thought you were speaking a little quickly. So you're saying Bhandari – you're relying on Bhandari's statement that he thought passengers – you have no record evidence in this trial that a passenger thought he was based on his going up and down the aisle and going into the bathroom? You have Sarah Lyons not using the word terrorist, but page 65 of the SCR. Okay, so just not terrorism then. So just clarify, because when you said, well, someone who threatens to have a bomb, it's not as serious as what this individual did. As far as I understand, before they called the pilot, all this man did was try to go to the bathroom, and he took, I thought, one photograph. Two photographs. Okay. What about the staring, though, right? He was staring at passengers, and that's why – He stared at passengers? What case says that's suspicious? Staring at passengers? Staring at passengers, dead stare, 20 to 30 seconds, and Sarah Lyons said, I thought he was working up some kind of a plan to me. This is behavior, Your Honor, which under the standard of when in doubt report should be reported 100 times out of 100 times. If there's an individual who is walking around a lot, the first five minutes when he's on the plane, walking around, and then walks around not just to go to the bathroom because he's a walker. So what case do you have where walking around is suspicion? Do you have any case that said that under the Montreal Convention or immunity? There's no case either way, but I think it's a question of just common sense. Okay, so it's common sense, and going in and out of the bathroom, is there any case that has said that adds to the suspicion quotient? Going in and out of the bathroom, with respect, Your Honor, I mean he is walking around. I'm just asking for case law because there's quite a bit. No, there are quite a few ALRs that assemble all these cases. Couldn't find a single one about going in and out of the bathroom. Couldn't find a single one about staring, and I couldn't find a single one about walking up and down the aisles. So I think you've got an issue of first impression, but you're saying there's no dispute of fact that's suspicion, but you can't point to a single case that any of those individual elements are suspicious. So I think your argument reduces to, can a person with their cell phone take a photograph of an attendant? But I don't see a case about that being suspicious. Saying I might have a bomb sounds very suspicious. An individual who's suffering a cardiac in the restroom, who is simply making noises and doesn't open the door, was enough an ill chiseled for the California Court of Appeals to find that ATSA is triggered. Your Honor, in the end, I respect your Honor's decision, but I'm just going to say if I was on this court Well, I've made no decision here. I'm just asking for a case law. 100 times out of 100, I would want, and all you're talking about is a report to law enforcement. So let me ask you this. There was an off-duty JetBlue airline pilot who was one of the witnesses who testified that he thought the behavior was suspicious. Remind me whether there was the record developed as to why he thought the behavior was suspicious. What did he point to? Because of Mr. Bandari walking around and staring at passengers with a dead stare 20 to 30 seconds on end. He's an off-duty pilot who's been in the industry, I think, for 25 years. Did he mention the staring and the repeated walking around? He mentioned that again. Pages 48 to 49. Did he use the expression you just did, death stare? Dead stare. I believe he used the word dead stare on page 48 and staring at passengers for 20 to 30 seconds. He felt concerned. Sarah Lyons felt concerned. And the question simply is, should there be a report? And the standard is, when in doubt, report. If you see something, say something. I go back to, I'd want the flight attendants, the airline employees, every single time to tell the law enforcement because, as Mr. Bandari himself admits, it's law enforcement officers who are supposed to determine and execute the response. They're the ones that Congress tasked after 9-11. The statutes enacted after 9-11 to effectuate a change. And no longer should the airline employees be the ones who do the investigation and the assessment. They're supposed to just say something. One question this all raises is just how much inquiry is there really meant to be into suspiciousness when you have a statutory exception for actual malice or sort of recklessness? Because no one's really alleging that. Absolutely. That is absolutely right. There should not be this sort of after-the-fact, 10 years later, scrutinizing with the jury. If you see something, say something. It's supposed to be virtually automatic. The Supreme Court said, Your Honor, immediately, report immediately. If you have any doubt, do it immediately. Certainly there was doubt here. No one disputes this. Do you think there should be any kind of limited inquiry into this? I mean, as to whether the circumstances rise to the level, even giving deference perhaps to a flight attendant's observations in some way? Do you think there's any room for sort of judicial reasoning here or jury finding? I say if there was not even room for doubt, that would be a situation. You know, an instance that comes up in a couple of these cases, like in Abdullah, is that there's an allegation of racial discrimination. That would be a limiting factor. But no one disputes here there was doubt. And we're not talking about anything aside from if you see something, you say something. And I'm just happy that there's a law enforcement officer on this plane. And I would want the flight attendants to say something to the law enforcement. And then it's his decision. The law enforcement officer could say, no, this is not enough. This record had no evidence that these passengers that were alarmed were motivated by discrimination? There were no statements in the criminal case that were quite severely discriminatory? I don't believe there's any record of racial discrimination here for the passengers. I don't believe there is, Your Honor. And I'd say it's up to Vahey at that point. He could have said, Your Honor, he could have said, I don't think staring is enough. He could have said going to the bathroom is not enough to me. He could have said that taking pictures is not enough. At that point, it's just – But the time he gets involved, isn't there already some kind of physical interaction going on in the first place? I mean, no one's coming to him saying, here's the situation. We've got somebody walking. We've got somebody staring. That's the issue. I mean, by the time he gets there, isn't there already sort of people flailing around? So once he gets the report, he said he heard, as he gets up, he heard audible shouting. He puts his badge around his neck, and he hears audible shouting at that point. And then he gets to the back, and he sees Mr. Bhandari acting erratically and his words out of control. It had already escalated at that point, but you're well over time. We appreciate your argument. Let me see if my colleagues have any additional questions. Nothing. Thank you. Thank you for your time, Your Honors. Your Honors, just three quick points. I would like to start with the text of ATSA, which, again, immunizes only disclosures of suspicious behavior. This entire inquiry around whether law enforcement directed the handcuffing is completely atextual. There's no text that says, you know, disclosures plus responses directed by law enforcement are immunized. So, once again, that's reading something in the text that's not there. If you're right about that, then the statute doesn't really do much, right? So somebody could have prevented a suit for defamation over the statement made to Vahe, but then nothing else? No, Your Honor. The statute still has a lot of effect, which is that any claims based on a report of suspicious behavior are immunized, including, for example, a false arrest claim or an intentional infliction of emotional distress. If a gate agent gives law enforcement a report and that's all the airline does, and then law enforcement goes and detains someone and you bring a false arrest claim against the airline on the basis of the report, that's immunized. And it's the same as to any other tort that's based, again, on the report to law enforcement. And Ilchishen, the case that my friend on the other side cited, is really helpful in this regard because it shows how broadly the nontextual view of the statute sweeps. There, the conduct issue was that flight attendants failed to provide medical help to a passenger who was in a bathroom and suffering a pulmonary embolism. And the California Court of Appeals held that that failure to provide medical aid was immunized. What are your other two points, Counsel? You have very little time. Okay, and my other point, sorry, were that on the suspicious transaction point, Your Honor, you asked whether there was any evidence that this was racially discriminatory. At ER 80, the passenger who said that Bandri was suspicious testified that terrorists have dark skin and dark hair. And similarly, the off-duty jet blue pilot likewise testified that Mr. Bandri looked like a terrorist. And so what you see there is that this whole suspicious transaction behavior is based on racial profiling. And that's why the jury— And what's your response to his efforts to impeach the verdict? He never brought that up earlier below. When there's no evidence that the verdicts—I mean, it's true that the verdict form was corrected, I guess, and so then a new verdict form was given to the jury. But the verdict that the district court adopted is the verdict where the jury found that there was no suspicious behavior. I think the procedure wrinkle is you didn't appeal the motion for new trials. That puts us in an interesting position. But the jury verdict is only persuasive in the sense that it shows that there's a dispute of fact over two key questions. One, whether Mr. Bandri engaged in any suspicious behavior because at least one reasonable jury has found that he didn't. And two, whether there was any injury prior to Vahe's arrival because at least one reasonable jury has found that he didn't—that there wasn't. Thank you very much, both sides, for your very helpful arguments this morning in this case. The matter is submitted.
judges: Higginson, NGUYEN, BRESS